IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO: 3:05 CV 161

| | |
|---|---|
| LEADFIRST & ASSOCIATES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) MEMORANDUM AND RECOMMENDATION |
| v. | ) |
| | ) |
| THE OHIO STATE UNIVERSITY | ) |
| MEDICAL CENTER, | ) |
| | ) |
| Defendant. | ) |

**THIS MATTER IS BEFORE THE COURT** on the Defendant's "Motion to Dismiss Claims of Leadfirst & Assoc., Inc." (Document No. 7) and "Memorandum of Law in Support..." (Document No. 8), filed June 10, 2005; the "Plaintiff's Response..." (Document No. 12), filed June 27, 2005; and the "Defendant's Reply..." (Document No. 14), filed July 28, 2005. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and is now ripe for the Court's consideration. Having fully considered the arguments, the record, and the applicable authority, the undersigned will respectfully recommend that the Defendant's motion to dismiss be granted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 17, 2003, the Plaintiff, Leadfirst & Associates, Inc. ("Leadfirst"), contracted with the Defendant, The Ohio State University Medical Center ("OSUMC"), to deliver the Plaintiff's "Perspective on Leadership" programs to the Defendant's managers on September 28-29, 2004 and November 10-11, 2004. Under the terms of the contract, the Defendant agreed to pay the Plaintiff $16,600.00 for each program. In addition, the contract provided that if the Defendant cancelled the

1

scheduled dates for the programs to be delivered by the Plaintiff, the Defendant would be invoiced by the Plaintiff for the program fee of $16,600.00, plus an additional fee in the amount of 10% of the program fee and any reimbursable expenses already incurred by the Plaintiff.

On March 31, 2004, the Plaintiff entered into a second contract with the Defendant to deliver the Plaintiff's "Leadership Development" programs to the Defendant's managers on January 20-21, 2005, April 19-20, 2005, June 8-9, 2005, September 14-15, 2005, October 12-13, 2005, November 9-10, 2005, and January 18-19, 2006. Under the terms of this second contract, the Defendant agreed to pay the Plaintiff $18,000.00 for each program. Like the first contract, the second contract provided that if the Defendant cancelled the scheduled dates for the programs to be delivered by the Plaintiff, the Defendant would be invoiced by the Plaintiff for the program fee of $18,000.00, plus an additional fee in the amount of 10% of the program fee and any reimbursable expenses already incurred by the Plaintiff.

In September 2004, the Defendant advised the Plaintiff that the Defendant would have to cancel and reschedule the programs to be delivered under the first contract. These programs were rescheduled for July 28-29, 2005 and August 30-31, 2005. When the Defendant cancelled the programs to be delivered under the first contract, the Plaintiff demanded that the Defendant pay the program fees, which the Defendant then paid in the amount of $33,200.00.

On December 22, 2004, the Defendant advised the Plaintiff that the Defendant was going to cancel the January 20-21, 2005 program. On January 3, 2005, the Defendant advised the Plaintiff that it was cancelling all programs and releasing all program dates. The Defendant then refused to pay program fee amounts as set out in the first and second contracts.

On April 18, 2005, the Plaintiff filed its complaint in this Court seeking damages for breach

of the first and second contracts. The Defendant filed its motion to dismiss on June 10, 2005 on the grounds that OSUMC is entitled to Eleventh Amendment immunity as an arm or alter ego of the state of Ohio. The Plaintiff contends that this Court does not have enough information to make a determination prior to discovery. Alternatively, the Plaintiff contends that OSUMC is not an arm or alter ego of the state of Ohio and is thus not entitled to Eleventh Amendment immunity.

**II. DISCUSSION**

The issue before the Court is whether OSUMC meets the criteria to be qualified as an arm or alter ego of the state and is therefore entitled to the state's Eleventh Amendment immunity. The Court finds that immunity does apply on these facts and recommends dismissal of the Plaintiff's complaint.

The Eleventh Amendment to the United States Constitution provides: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. When a suit is brought against a public entity, rather than directly upon the state, application of the Eleventh Amendment turns on whether or not the entity can be characterized as an arm or alter ego of the state. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977).

In order to determine if a public entity qualifies as an arm or alter ego of the state, the Fourth Circuit has applied a four-point test. *Md. Stadium Authority v. Ellerbe Becket, Inc.,* 407 F.3d 255, 261 (4th Cir. 2005) (citing *Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n,* 822 F.2d 456, 457-58 (4th Cir. 1987)). The factors to be considered are: 1) whether the state treasury may be responsible for paying any judgment that might be awarded; 2) whether the entity exercises a

significant degree of autonomy from the state; 3) whether the entity is involved with local versus statewide concerns; and 4) how the entity is treated as a matter of state law. *Md. Stadium Authority*, 407 F.3d at 261. The Supreme Court has made it clear that the most important, and likely dispositive, of these factors is whether the state treasury may be responsible for paying any judgment that might be awarded. *Hess v. Port Authority Trans-Hudson Corporation*, 513 U.S. 30, 31, 115 S.Ct. 394, 396, 130 L.Ed.2d 245 (1994).

**A. Effect on State Treasury**

To assess the effect a judgment may have on the state treasury, the Court must analyze both the technical and practical effects of the judgment. *See Ristow v. South Carolina Ports Authority,* 58 F.3d 1051, 1053 (4th Cir. 1995), *cert. denied,* 516 U.S. 987 (1995) (stating the Court is required to employ not only a legal test, but also a practical analysis). It is not enough to determine whether or not statutes or case law exist imposing liability *per se* on the state. *Ristow,* 58 F.3d at 1053. Rather, the Court must determine whether a judgment against OSUMC will have any real effect on state funds.

Here, the Plaintiff contends that the report entitled "Sources and Uses of Funds for Fiscal Year Ending June 30, 2001" demonstrates that the state of Ohio is not liable, technically or practically, for any losses or debts of the medical center. More specifically, the Plaintiff's contention is that OSUMC receives a very small amount of its total revenue from direct state appropriations, generates much of its own revenue independently through patient care and private donations, and thus, any judgment will be paid by OSUMC itself. The Defendant contends that any funds of OSUMC are state funds, and thus any judgment against OSUMC does have a practical effect on the state treasury. The Court agrees with the Defendant.

As the definition of OSUMC indicates, OSUMC is in large part an umbrella title for the various Ohio State University hospitals and research centers. OSUMC is defined by the Bylaws of the Board of Trustees of the Ohio State University to include:

> the college of medicine and public health; the Prior [sic] health sciences library; centers designated by the provost to be part of the academic medical center; and all hospitals, health services, and health care delivery enterprises owned and/or operated wholly or in part by the university exclusive of: 1) Those clinics operated by other colleges; and 2) The departmental practice plan corporations.

Bylaws of the Board of Trustees of the Ohio State University, at § 3335-1-03(J) (Document No. 14).

The financial effect on the state treasury of a suit against the Ohio State hospitals was analyzed in *Daniel v. American Board of Emergency Medicine*, 988 F.Supp. 127 (W.D.N.Y. 1997). In *Daniel,* the Court stressed that though only 2.8% of the hospitals' total revenues were attributable to direct state appropriations, "no statutory limitation exists restricting the amount of money that the University hospitals may receive from the state." *Daniel,* 988 F.Supp at. 160-61. The Court further commented, in granting Eleventh Amendment protection, that "the nature of the state's [legal] obligation to contribute may be more important than the size of the contribution." *Daniel,* 988 F.Supp. at 161 (quoting *Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 660 (3rd Cir. 1989)). Furthermore, *Daniel* pointed out that even though "'by statute, the Ohio legislature permits the state colleges and universities to retain [self-generated] funds, rather than requires them to be paid into the treasury and then appropriated back to the schools as needed...it could just as easily amend that statute to require the converse.'" *Daniel,* 988 F.Supp. at 160 (quoting *Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299, 304 (6th Cir. 1984)).

The rationale applied by the Western District of New York in *Daniel* applies with equal force

5

to OSUMC in this case. Since OSUMC is essentially a compilation of the Ohio State University hospitals, this argument is directly on point. It demonstrates that a judgment against OSUMC has a practical effect on the state funds of Ohio.

The Plaintiff relies partly on *Hess v. Port Authority Trans-Hudson Corporation,* which denied Eleventh Amendment protection to the Port Authority based largely on financial self-sufficiency. *Hess v. Port Authority Trans-Hudson Corporation*, 513 U.S. at 31, 115 S.Ct. at 396, 130 L.Ed.2d 245. In *Hess*, the Supreme Court held that the Port Authority was not entitled to Eleventh Amendment protection, as it was entirely self-sufficient. *Hess,* 513 U.S. at 49, 115 S.Ct. at 405, 130 L.Ed.2d 245. However, the Court pointed to a low statutory ceiling on the amount which promised state appropriations would total, as well as an agreement that such appropriations apply only until the Port Authority was able to sustain itself through its own revenue. *See Hess,* 513 U.S. at 37, 115 S.Ct. at 399, 130 L.Ed. 245. Furthermore, the court noted that the agency had received no money through state appropriation for decades. *Hess,* 513 U.S. at 45, 115 S.Ct. at 403, 130 L.Ed.2d 245.

These concerns are not raised here. There is no ceiling on the amount of money the state has promised to appropriate to OSUMC, nor is there any indication that the state of Ohio's contributions are dependent on the self-sufficiency of OSUMC. This Court finds that any obligation of OSUMC is an obligation of the state and weighs this factor in favor of granting OSUMC Eleventh Amendment immunity.

**B. Level of Autonomy from the State**

OSUMC does not exhibit a significant degree of autonomy from the state of Ohio. The Plaintiff contends that the distinct leadership of OSUMC from Ohio State University indicates that OSUMC is not subject to the same level of state control. Again, the Defendant points to *Daniel*,

where this argument was presented against the Ohio State University hospitals. There it was held, "[a]s the degree of control over the University Hospital by the OSU Trustees and, through the OSU Trustees, the governor of Ohio is fairly substantial, and the Ohio courts, both federal and state, have determined Ohio State University and the Defendant University Hospital to be instrumentalities of the state, the court finds that the autonomy factor weighs in favor of according [sic] Eleventh Amendment immunity to the University Hospital." *Daniel*, 988 F.Supp. at 158. This Court finds the same with regard to OSUMC.

Though OSUMC is governed by a distinct board from that of Ohio State University, the level of its autonomy is illusory. The members of the University Hospitals Board, which govern the hospitals that are a large part of OSUMC, are selected by the Ohio State University Board of Trustees. Bylaws of the Board of Trustees of The Ohio State University as of June 7, 2005, § 3335-1-03(T)(2) (Document No. 14-2). The members of the Ohio State University Board of Trustees are in turn appointed by the governor of Ohio, with the advice and consent of the state senate. *Daniel*, 988 F.Supp. at 158 (citing Ohio.Rev.Code Ann. § 3335.07 (Baldwin 1995)). This chain of authority leading directly to the governor is an indication that OSUMC is an arm or alter ego of the state.

Furthermore, it is clear that the University Hospitals Board must answer to the Ohio State University Board of Trustees in carrying out many of its responsibilities. The University Board Bylaws, in its definition of the hospital board, states, "The body *responsible to the Ohio state university board of trustees* for oversight of patient care services, financial performance, and the university hospitals' support of the Ohio state university health sciences academic program, shall be known as the university hospitals board." University Hospitals Board Bylaws, § 3335-93-01 (2001) (Document No. 14) (emphasis added). Among other duties, the hospital board is responsible for

review and approvals of operating and capital budgets and monitoring financial performance, "subject to the authority and periodic review of the university board of trustees." University Hospital Board Bylaws, §3335-93-02 (2001) (Document No. 14). Significantly, "these bylaws may be amended or replaced in whole or in part by the Ohio state university board of trustees." University Hospital Board Bylaws, § 3335-103-01 (2001) (Document No. 14). Finally, the Chief Executive Officer of OSUMC is also the Dean of the College of Medicine and Public Health of Ohio State University. (Document No. 12).

The foregoing factors make it clear that OSUMC is not truly a distinct entity from Ohio State University, and thus not far removed from the state of Ohio. This Court finds that OSUMC is sufficiently subject to the control of the state to be afforded Eleventh Amendment immunity.

**C. Statewide versus Local Concerns**

OSUMC is engaged in statewide rather than local concerns. OSUMC has a clear role in advancing the academic mission of the university, specifically in the areas of higher education and public health. This is a statewide concern, and has been held to be such by other Courts. *See, e.g., Daniel*, 988 F.Supp. at 161 (contrasting the powers of the university hospitals which are to promote the higher education of the medical schools against more local governmental functions); *Hall,* 742 F.2d at 305 (stating, "[p]roviding facilities and opportunities for the pursuit of higher education is a long recognized governmental function"). The Court finds that OSUMC is engaged in statewide concerns which weighs in favor of granting OSUMC Eleventh Amendment immunity.

**D. State Law**

The record is void of state statutes, regulations, or constitutional provisions which characterize OSUMC as an arm or alter ego of the state. However, state and federal case law provide

8

precedent for providing OSUMC Eleventh Amendment immunity. Eleventh Amendment immunity has been extended to Ohio State University, instrumentalities of other Ohio universities, and specifically to medical colleges. *See, e.g., Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299 (6th Cir. 1984) (affirming that the Medical College of Ohio at Toledo was an arm of the state and thus immune from suit); *Bailey v. Ohio State University,* 487 F.Supp. 601 (S.D. Ohio 1980) (holding that the level of control by the state of Ohio over Ohio State University was enough to deem the University an alter ego of the state). More importantly, it has been extended to cover the Ohio State University hospitals and OSUMC. *See Matteson v. Ohio State University,* No. C2-99-1267, 2000 WL 1456988, at *3 (S.D. Ohio Sept. 27, 2000) (granting Eleventh Amendment immunity to OSUMC); *Boggs v. State*, 455 N.E.2d 1286, 8 Ohio St.3d 15 (Ohio 1983) (holding that Ohio State University hospitals warrant Eleventh Amendment protection).

The *Matteson* Court, in dealing with this issue, stated, "[a]s a threshold matter, although Plaintiff named the Ohio State University Medical Center and the Ohio State University Hospitals as defendants along with Ohio State University, it is undisputed that the medical center and the hospitals are in fact part of the university." *Matteson v. Ohio State University,* No. C2-99-1267, 2000 WL 1456988, at *3 (S.D. Ohio Sept. 27, 2000). The District Court dealt with the matter in similar summary fashion in *Bell v. The Ohio State University,* No. 2:98-CV-1274, 2002 WL 193694, at *7 (S.D. Ohio Feb. 5, 2002). In a suit against several entities and employees of Ohio State University, including employees of OSUMC, *Bell* made no distinction between OSUMC and the other entities in stating, "[a]s a preliminary matter, however, the Court finds that to the extent Plaintiff sues the individually named Defendants in their official capacities, the Plaintiff's claims are barred by the Eleventh Amendment." *Bell,* 2002 WL 193694, at *7.

9

Based on these four factors, the undersigned finds that OSUMC is entitled to Eleventh Amendment protection as an arm or alter ego of the state of Ohio, and respectfully recommends that the Defendant's motion to dismiss be granted.

### III. RECOMMENDATION

**FOR THE FOREGOING REASONS,** the Court respectfully recommends that the Defendant's "Motion to Dismiss Claims of Leadfirst & Assoc., Inc." (Document No. 7) be **GRANTED**.

### IV. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this memorandum must be filed within ten (10) days after service of same. *Snyder v. Ridenour*, 889 F.2d 1363, 1365 (4th Cir. 1989); *United States v. Rice*, 741 F. Supp. 101, 102 (W.D. N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court, *Snyder*, 889 F.2d at 1365, and may preclude the parties from raising such objections on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841, 845-46 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties and the Honorable Robert J. Conrad, Jr.

Signed: June 13, 2006

David C. Keesler
United States Magistrate Judge